UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RSUI INDEMNITY COMPANY,

       Plaintiff,

v.                                                      CASE No. 8:13-CV-2629-T-30TGW

AKSHAY M. DESAI,
*et al.*,

       Defendants.

_____

## REPORT AND RECOMMENDATION

      The proponents for a settlement agreement have filed a Dispositive Joint Motion to Enforce Settlement Against Defendants, Akshay M. Desai and Seema Desai and Request to Remove from Trial Docket and Continue all Deadlines Pending Adjudication of the Settlement (Doc. 116).[1] The proponents contend that a valid settlement agreement exists between the parties and, therefore, it should be enforced against the opponents Dr. Akshay M. Desai and Seema Desai.  The opponents counter that an enforceable agreement does not exist and that they never assented to the settlement agreement.

_____

[1] Citation of page numbers corresponds to the page numbers in CM/ECF.

The proponents have not demonstrated that an enforceable settlement agreement exists. I therefore recommend that the motion to enforce the settlement agreement against Dr. Akshay M. Desai and Seema Desai be denied.

I.

This case has a long and lengthy history involving settlement negotiations between the parties involved in this case and non-parties from other related cases. In October 2013, the plaintiff, RSUI Indemnity Company ("RSUI"), filed a complaint seeking a declaratory judgment against the defendants regarding a Directors and Officers Liability Policy that it issued on November 1, 2012, to defendant Universal Health Care Group, Inc. ("Universal")[2] (Doc. 1).[3] RSUI claims that it issued the policy based on false information contained in an application for insurance, and, contrary to the

---

[2]According to the complaint, Universal is a health maintenance company that is based in St. Petersburg, Florida (Doc. 1, p. 3). Universal "provides managed care services for government sponsored healthcare programs" (id.). In February 2013, Universal filed for Chapter 11 bankruptcy (Doc. 80, p. 2).

Universal is the parent company to Universal Health Care Insurance Company ("UHCIC") and Universal Health Care, Inc. ("UHC") (Doc. 1, p. 3).

The Florida Department of Financial Services is the Receiver for Universal and UHCIC (id., p. 1).

[3]United States District Judge James S. Moody entered an Order granting RSUI's Motion for Summary Judgment regarding Count II of the complaint (Doc. 80). Therefore, only Counts I and III remain at issue (see id.).

information provided in the insurance application, Universal's financial condition had worsened rather than improved (see id.). Therefore, along with other relief, RSUI seeks a declaratory judgment that, due to various misrepresentations on the insurance application, there is no coverage under the policy and that it may recoup its defense costs of certain defendants.[4]

After several unsuccessful settlement discussions, the proponents,[5] consisting of the plaintiff and certain defendants, now seek to enforce a settlement agreement against the opponents, Dr. Akshay M. Desai and Seema Desai ("Desais")[6] (Doc. 116). The proponents claim that, although the Desais have not signed the settlement agreement, it should be

---

[4]Under Count I of the complaint, RSUI is seeking a declaration that there is no coverage under the policy for defendants Dr. Akshay M. Desai, Sandip I. Patel, Jeff Ludy, Deepak Desai, and Steven J. Schaefer, due to the misrepresentations contained in the insurance application (Doc. 1, pp. 17-18).

Under Count III of the complaint, RSUI is seeking a declaration that it has no duty to indemnify defendants Dr. Akshay M. Desai, Sandip I. Patel, Jeff Ludy, and Deepak Desai for The Clawback Letters (id., p. 19). "The Clawback Letters seek to avoid and recover bonus or other compensation received by [d]efendants" Dr. Akshay M. Desai, Sandip I. Patel, Jeff Ludy, and Deepak Desai (id., p. 19).

[5]The proponents that seek to enforce the settlement agreement are the plaintiff RSUI and defendants Sandip I. Patel; Jeff Ludy; Deepak Desai; Steven J. Schaefer; the Receiver, the Florida Department of Financial Services for UHCIC; and the Trustee, Soneet R. Kapila, the liquidating agent of Universal (Doc. 116, p. 1).

[6]The Desais were officers and directors of UHCIC (Doc. 1, pp. 1-2). Dr. Desai was the CEO and director of Universal (Doc. S-133, p. 4). Seema Desai was a director of Universal (id.).

enforced against them because the parties have agreed to all essential terms of the settlement agreement.

Various settlement discussions occurred between the parties and non-parties to attempt to reach a global settlement. Thus, RSUI, the defendants, and nonparty BankUnited[7] participated in mediation on February 25-26, 2015, in Tampa, Florida, and then on April 21, 2015, in Miami, Florida (id., p. 2). Subsequently, on June 30, 2015, RSUI, the defendants, and Navigators Insurance Company ("Navigators"), (an excess insurance carrier and a non-party to this case), participated in mediation in New York City (id.).[8] No settlement agreement was signed.

On October 15, 2015, the parties filed with the court the "Parties' Second Joint Status Report To Court"[9] (Doc. 96). According to the status

---

[7]The proponents explain that BankUnited is a lender for Universal (Doc. S-133, pp. 3-4).

[8]According to the proponents, the parties were seeking a global resolution that included and affected all insurance carriers (Doc. 116, p. 2). The proponents explain they sought "a global resolution that would provide an additional source of recovery for the Fiduciaries and establish a defense reserve for the [i]ndividual [d]efendants" (Doc. S-130, p. 3).

[9]On May 5, 2015, the parties filed with the court the "Parties' Joint Notice to Court of Settlement in Principle and Motion to Extend Stay Period" (Doc. 90). The parties indicated that they had reached a settlement agreement in principle and requested an extension of the stay period (id.). The parties explained they were "currently in the process of drafting and finalizing a term sheet and written agreement that reflects their [s]ettlement" (id., p. 2).

On June 29, 2015, the parties filed a joint motion requesting an extension of time

report, a settlement was not reached between the parties and Navigators during the June 30, 2015, mediation in New York City (id., p. 2). However, the parties continued to use the mediator after the June mediation to reach a settlement agreement between the parties and Navigators (id.). The parties also indicated that they continued to have weekly discussions in order to work towards a resolution (id., p. 3). Thus, the parties explained that "the [d]efendants and Navigators have reached an agreement in principal that will globally resolve the [d]efendants' dispute with RSUI and Navigators" (id.). The parties indicated that they were "currently in the process of drafting a written settlement agreement and intend to work with all due haste to have it finalized and executed" (id.). After the settlement agreement is finalized, the parties would then seek final approval of the agreement from the United States Bankruptcy Court for the Middle District of Florida and the Circuit Court of the Second Judicial Circuit for Leon County, Florida (id., p. 3).

Thereafter, on November 16, 2015, the parties filed a "Parties' Third Joint Status Report to Court" (Doc. 97). According to the status report, the "[d]efendants drafted a complete global settlement agreement that has

---

for the stay period because the parties were going to negotiate with Navigators to reach a global settlement (Doc. 92).

undergone multiple rounds of review and comment" (id., p. 3). It stated the settlement discussions is a "process [that] is ongoing" (id.). The parties explained they anticipated by the following month, a final agreement would be fully executed and they would have already sought approval of the settlement with the appropriate courts (id.). Subsequent joint status reports filed with the court highlight that the parties did not execute a final settlement agreement (see Docs. 98, 99, 100). Consequently, the dispute in this case arose when the Desais refused to sign the settlement agreement.

The Desais do not dispute that in October 2015 there was a settlement agreement in principle between the parties and Navigators (Doc. S-133, p. 7). However, the Desais submit that the settlement agreement after October 2015 underwent various rounds of red-lining and circulation between the parties' counsel and, therefore, they have not agreed to a final version of the settlement agreement that was proposed by the Fiduciaries[10] to them in May 2016 (id., p. 10). In particular, the Desais explain that they will not agree to a mutual release with BankUnited, and that a new term called a "blow-up" provision had been added to the agreement without their consent

---

[10]The Desais in their memorandum refer to the Fiduciaries, which includes the Florida Department of Financial Services (the Receiver for UHCIC) and Soneet R. Kapila, (the trustee), the liquidating agent of Universal (Doc. S-133, p. 2; see also Doc. 116, p. 1).

(id., p. 21). The Desais further submit that in December 2015, BankUnited would not agree to a settlement unless it contained mutual releases between it and the Desais (id., pp. 9, 19).

The Desais state that in December 2015 the Fiduciaries sent a draft of the settlement agreement (that the Desais did not agree with) to RSUI for review (id., p. 9). According to the Desais, they did not have further discussions with the Fiduciaries about the settlement agreement (id.). The Fiduciaries subsequently negotiated with RSUI. Thereafter, in May 2016, the Fiduciaries presented the Desais with a settlement agreement for their approval (id., p. 10). The Desais again did not sign the agreement because it still contained the mutual release with BankUnited and a new term referred to as a "blow-up" provision.

The proponents then filed a joint motion to enforce the settlement agreement against the Desais (Doc. 116). The proponents seek to enforce the settlement agreement, asserting that all essential terms of the settlement agreement have been agreed upon by all the parties, including the Desais (id.). The motion was referred to me for a report and recommendation (Doc. 136). A status conference was held and the proponents' joint motion to enforce the settlement agreement was discussed (Doc. 128). Thereafter,

an Order was entered directing the parties to each file submissions in support of their positions and the proponents were also given an opportunity to file a reply to the Desais' opposition memorandum (Doc. 129). The parties have filed their memoranda and supporting exhibits (Docs. S-130; S-133, S-134).[11]

## II.

"Principles governing Florida contract law apply to the interpretation and enforcement of settlement agreements." Conte v. Winn Dixie Stores, Inc., 2014 WL 4693072 at *2 (N.D. Fla. 2014); see Resnick v. Uccello Immobilien GMBH, Inc., 227 F.3d 1347, 1350 (11th Cir. 2000). Settlement agreements are favored and encouraged to conserve judicial resources and will be enforced when possible. Murchison v. Grand Cypress Hotel Corp., 13 F.3d 1483, 1486 (11th Cir. 1994); Spiegel v. H. Allen Holmes, Inc., 834 So.2d 295, 297 (Fla. Dist. Ct. App. 2002).

"Oral settlement agreements are enforceable under both federal and Florida law." Conte v. Winn Dixie Stores, Inc., supra, 2014 WL 4693072 at *2. "To compel enforcement of a settlement agreement, its terms must be sufficiently specific and mutually agreed upon as to every essential element."

---

[11]The parties have also submitted a Joint Stipulation of Parties to Authenticate Documents for Purposes of Dispositive Motion to Compel Enforcement of Settlement (Doc. 135). The joint stipulation indicates that the parties agree to the authenticity of the attached exhibits to their respective memoranda (id.).

Id. A party seeking to enforce a settlement agreement must show that the opposing party assented to the agreement's terms. Id.; Spiegel v. H. Allen Holmes, Inc., supra. "As long as an intent to settle essential elements" of the case is established, the settlement agreement does not have to be "fully executed or reduced to writing[.]" Conte v. Winn Dixie Stores, Inc., supra, 2014 WL 4693072 at *2 (internal quotations omitted).

### III.

As indicated, the proponents seek to enforce the settlement agreement, arguing that the parties, including the Desais, have agreed to its essential terms and, therefore, it should be enforced against the Desais (Doc. S-130). The Desais counter that they have not agreed to the current version of the settlement agreement and, therefore, it cannot be enforced against them (Doc. S-133).

### A. Mediation Privilege

First, the Desais argue that the mediation privilege applies, and the proponents are relying improperly upon privileged communications to enforce the settlement agreement, although they say, further, they are not hiding behind the privilege (Doc. S-133, pp. 11-15). The Desais assert that there was no written term sheet or a mediation settlement agreement derived

from the mediations and, therefore, the communications relied upon by the proponents to enforce the settlement are privileged under Florida law due to the mediation privilege (id., p. 12-15). The proponents counter the mediation privilege does not apply because the parties voluntarily had settlement discussions and, therefore, the court did not mandate mediation (Doc. S-134, pp. 6-9). Consequently, the proponents argue that the Florida Rules of Civil Procedure and the Florida statutes pertaining to the mediation privilege are inapplicable in this case.

Because the Desais are asserting the mediation privilege, they bear the burden to demonstrate that the communications from the mediations are protected. Bradfield v. Mid-Continent Casualty Co., 15 F.Supp.3d 1253, 1256 (M.D. Fla. 2014). The Desais have not met their burden to show that the mediation privilege should be applied in this case. Further, even if a privilege would apply, they have waived the privilege.

Under Florida law, the Florida Rules of Civil Procedure and the Florida statutes set forth the rules and procedures governing mediation. According to Fla.R.Civ.P. 1.700(a), a judge may enter an order referring the parties to mediation. The Florida statutes also set forth the rules governing the mediation privilege. Fla. Stat. § 44.405.

The proponents assert various reasons that the mediation privilege is inapplicable in this case, including that the parties did not attend court ordered mediation but, rather voluntarily attended mediation (Doc. S-134, pp. 6-9).   Therefore, the proponents argue the Florida Rules of Civil Procedure and the Florida statutes have no bearing in this matter. There is no dispute that the parties were not ordered by the court to attend the mediations.[12]   However, the parties signed a confidentiality agreement to govern communications during mediation.   Consequently, it is unnecessary to determine whether the mediation privilege pursuant to the Florida statutes applies in this case.

The parties mediated pursuant to a JAMS Mediation Agreement (see Doc. S-133-1, Ex. A; see also Doc. S-130-4, Ex. D (bill from mediator)). Article III of the mediation agreement has a confidentiality provision and it designates that mediation communications are to be confidential (Doc. S-133-1, Ex. A, p. 2).   However, the proponents point out that neither the mediation agreement nor the Florida statutes apply to the discussions that occurred after mediation (Doc. S-134, p. 9).   Significantly, there is no dispute that mediation

---

[12]On May 31, 2016, this court ordered the parties to mediate (Doc. 108), however, mediation was stayed due to this motion (Doc. 129, p. 2).

with the hired mediator ended on October 30, 2015,[13] and the parties did not utilize the mediator after that date (Doc. S-133, p. 7; Doc. S-134, p. 9; see also Doc. S-130-4, Ex. D, p. 2). Therefore, the mediation privilege cannot apply to those discussions occurring after that date. See Altheim v. Geico General Insurance Co., 2010 WL 5092721 *1 (M.D. Fla. 2010) (privilege does not apply to communications outside the mediation process).

Notably, the Desais have not identified the communications that would be protected under the mediation privilege, thus waiving any claim (see Doc. S-133, pp. 3, 11-15). Moreover, the main thrust of the proponents' motion centers around the e-mails that occurred after October 2015. Consequently, the Desais have not identified communications that would be covered by the mediation privilege, much less shown that the privilege is applicable.[14] In all events, as indicated, those communications that are at the heart of this issue are those that occurred after mediation took place and, therefore, the mediation privilege is inapplicable in this case.

---

[13] The invoice from the mediator lists October 30, 2015, in the bill for services (Doc. S-130-4, Ex. D, p. 2).

[14] Arguably, Rule 408, F.R. Evid., dealing with settlement communications, might apply. See Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 641-42 (11th Cir. 1990). The Desais do not mention that rule; therefore, discussion of that rule is not warranted.

## B. Enforcement

The proponents argue the draft settlement agreement should be enforced against the Desais because the parties have agreed to all essential terms (Doc. S-130, pp. 10-12).  The proponents assert that as early as April 2015, the Desais orally agreed to the essential terms of the settlement agreement, and did so again in October 2015 (id., p. 10).  The Desais counter that they (as well as the other parties) have not agreed to all essential terms (Doc. S-133, pp. 15-21).  They explain that they have not signed the agreement because it contains a mutual release with BankUnited and there was a new condition added to the agreement that they refer to as a "blow-up" provision (id., pp. 18-21).  The Desais clarify that there was an agreement in October 2015 with Navigators, however, the settlement agreement went through revisions after that time, including the addition of the "blow-up" provision (id., pp. 17-21).  The Desais' arguments are persuasive.

In order to have an enforceable agreement, the "terms must be sufficiently specific and mutually agreed upon as to every essential element." Conte v. Winn Dixie Stores, Inc., supra, 2014 WL 4693072 at *3; Woodfield Plaza, LTD. v. Stiles Construction Co., 687 So.2d 856, 857 (Fla. Dist. Ct. App. 1997).  An essential term is determined on a case by case basis and the

court must look to the "nature and complexity of each transaction." King v. Bray, 867 So.2d 1224, 1228 (Fla. Dist. Ct. App. 2004). Thus, "incomplete agreements do not establish a sufficient meeting of the minds..." that is "specific and mutually agreeable as to every essential element." Cheverie v. Geisser, 783 So.2d 1115, 1118 (Fla. Dist. Ct. App. 2001) (internal citations and quotations omitted). Therefore, "the evidence must clearly demonstrate that there was mutual agreement to the material settlement terms." Id. The settlement agreement must "be clear that it is full and complete, covers all issues, and is understood by all litigants concerned." Gaines v. Nortrust Realty Management, Inc., 422 So.2d 1037, 1040 (Fla. Dist. Ct. App. 1982) (internal citations and quotations omitted).  An objective test is used and, therefore:

> The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs–not on the parties having meant the same thing but on their having said the same thing.

Blackhawk Heating & Plumbing Co, Inc. v. Data Lease Financial Corp., 302 So.2d 404, 407 (Fla. 1974) (internal citation and quotations omitted); Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla. 1985) (same).

Importantly, "an acceptance must contain an assent to the same matters contained in the offer." Cheverie v. Geisser, supra, 783 So.2d at 1119 (internal citations and quotations omitted); Nichols v. The Hartford Insurance Co. of the Midwest, 834 So.2d 217, 219 (Fla. Dist. Ct. App. 2002); Lickert v. Pike, 736 So.2d 724, 725 (Fla. Dist. Ct. App. 1999); Williams v. Ingram, 605 So.2d 890, 893 (Fla. Dist. Ct. App. 1992). Further, when parties agree to agree in the future, there is no enforceable contract until after negotiations are completed. See Dows v. Nike, Inc., 846 So.2d 595, 602 (Fla. Dist. Ct. App. 2003) (explaining parties' settlement agreement was not final until negotiations were completed and final agreement superceded any prior "conceptual settlement"); Suggs v. Defranco's, Inc., 626 So.2d 1100, 1101 (Fla. Dist. Ct. App. 1993) (an agreement in concept is not enforceable when essential terms are left open for negotiations in the future).

The burden is on the party seeking enforcement of a settlement agreement to demonstrate with substantial and competent evidence that there was a meeting of the minds between the parties. Cheverie v. Geisser, supra; Williams v. Ingram, supra.

### 1. Complete Agreement not Reached in Mediation

Initially, it is important to note that the parties did not have a complete agreement as suggested by the proponents. The proponents submit that the parties had an agreement in principle as early as April 2015 (Doc. S-130, p. 10). However, the evidence demonstrates that the draft of the settlement agreement went through various red-lining between counsel of the parties and non-parties to this case, including further negotiations after April 2015, well into May 2016. Therefore, it cannot be said that a global settlement was reached in April 2015. Indeed, the mediator was still involved until October 2015.

The proponents assert that the joint statuses filed by counsel, including counsel for the Desais, are evidence that the parties had an agreement in principle (id., pp. 4-8). However, those joint filings reflect that the parties did not have a complete agreement, and that the parties were still in the process of drafting, and negotiating, the terms of the agreement. Trudging through the time line of events in this case demonstrates that the parties had not reached a settlement agreement.

For example, on May 5, 2015, the parties filed the Parties' Joint Notice to Court of Settlement in Principle and Motion to Extend Stay Period

(Doc. 90). The joint notice was signed by counsel for the proponents and for the Desais (id., p. 3). According to the joint notice, the parties indicate "they have reached a settlement in principle (the "[s]ettlement") that would eliminate the need for further litigation between the [p]arties in this matter" (id., pp. 1-2). However, the agreement was not executed and the parties indicate that they were still "in the process of drafting and finalizing a term sheet and written agreement that reflects their [s]ettlement" (id., p. 2).[15]

The e-mails between counsel also demonstrate that a settlement agreement was not reached in April 2015. For example, the Desais explain that around this time a draft of the Settlement Term Sheet generated by the Fiduciaries was circulated among counsel. Not all of the parties agreed to it because it required the defendants "to make a substantial payment to the Fiduciaries in exchange for essentially nothing" (see Doc. S-133, pp. 5-6). According to an e-mail sent by a defense counsel to RSUI's counsel and the Desais' counsel on May 14, 2015, counsel claimed the term sheet is "worthless[,]" "[a]lmost silly[,]" and it would be malpractice to have his

---

[15]The joint status also indicates that after the agreement was executed it required final approval by "(1) the United States Bankruptcy Court for the Middle District of Florida in *In re Universal Health Care Group, Inc.*, Case No. 8:13-bk-01520-KRM, and *In re American Managed Care, LLC*, Case No. 8:13-bk-01520-KRM, and (2) the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida, *In re The Receiverships of Universal Health Care, Inc., and Universal Health Care Insurance Company, Inc.*, Case Nos. 2013-CA-000358 and 2013-CA-000375" (Doc. 90, p. 2).

clients sign it (Doc. S-133-1, Ex. C, p. 12). The next day, counsel for the Trustee advised the other parties not to review the document because a meeting with Navigators may require that the parties would "need to paper [our] deal differently" (Doc. S-133-1, Ex. D, p. 15). Therefore, no agreement at this point had been reached between the parties.

On June 29, 2015, the parties filed a joint motion for an extension of the stay in the case (Doc. 92). According to the motion, on June 30, 2015, the parties were going to attend a mediation with Navigators (id., p. 2). Clearly, an agreement had not been fully reached in April 2015 between the parties involved in this global settlement as the parties were still in the process of settlement discussions. Indeed, on October 15, 2015, the parties filed a joint status report that indicates a settlement had not been reached with Navigators during the mediation in June (Doc. 96, p. 2). However, the parties indicate that they had "made substantial progress toward reaching a settlement" and that the "[d]efendants and Navigators have reached an agreement in principle that will globally resolve the [d]efendants' dispute with RSUI and Navigators" (id., pp. 2-3). The joint status also informed the court that the parties were "in the process of drafting a written settlement agreement and intend to work with all due haste to have it finalized

and executed" (id., p. 3). Thus, the evidence demonstrates that the settlement agreement at this point in time was still being negotiated and, therefore, not fully complete.

The Desais state that they had an agreement with Navigators in October 2015, but that agreement's "only substantive term" was in regard to the amount of the reserve needed to pay the costs for their defense in civil and criminal law suits (Doc. S-133, p. 17). Thus, the Desais submit that this agreement was "assuming that agreement could be reached on the underlying deal with the primary insurer RSUI and the Fiduciaries" (id.). An e-mail from Desais' counsel to the mediator on October 9, 2015, indicates that the Desais had accepted an offer from Navigators regarding the reserve (see Doc. S-130-3, Ex. C, p. 2).[16]

However, there was more to the negotiation process.[17] Thereafter, an e-mail sent by the Receiver's counsel to counsel for the other

---

[16]The e-mail states "The D's and O's accept the last offer from Navigators providing a reserve of $500,000 for 3 years to pay for all criminal and civil defense costs" (Doc. S-130-3, Ex. C, p. 2).

Another e-mail dated October 7, 2015, outlined the amount of payment to the Fiduciaries and the amount of the reserve (Doc. S-130-2, Ex. B, p. 2). It also included a new request regarding a dispute over the settlement agreement concerning payment of costs (id., p. 3).

[17]Counsel for the Receiver on October 27, 2015, circulated an e-mail with an attachment of the draft settlement agreement (Doc. S-133-1, Ex. E, p. 18).

parties, attached a version of the settlement agreement for counsel to red-line (Doc. S-133-1, Ex. E, p. 18). The e-mail also informed the parties that the agreement required approval by the defendants and the Fiduciaries before it could be sent to RSUI for its approval (id.). Thus, this e-mail acknowledges the draft agreement required the defendants' approval.

The submission of the "Parties' Third Joint Status Report to Court" on November 16, 2015, indicates that the parties had not completely reached a settlement (Doc. 97). Thus, it states that "the [d]efendants drafted a complete global settlement agreement that has undergone multiple rounds of review and comment" and that "[t]his process is ongoing" due to the "complexity of the issues" (id., p. 3). Further, the status report indicates that the parties were anticipating that in the following month of December, that they would be able to report to the court that "a final agreement has been fully executed" (id.). Because the parties were still in the process of reviewing the settlement agreement, a final settlement agreement had not been reached.

The few e-mails that were circulated between counsel during November 2015 provide some clarification on the matter. It is clear that counsel for the parties were circulating a draft of the settlement agreement and that they continued to make changes to the agreement (see Doc. S-130-5,

Ex. E, p. 2; Doc. S-133-1, Ex. F, p. 31). An e-mail dated November 19, 2015, sent by the Desais' counsel to the other parties, indicates that there was some agreement to some of the changes that were made to the draft agreement (Doc. S-130-5, Ex. E, p. 2). Thus, counsel for the Desais states that attached to the e-mail "is our response to your redlined version, which accepts the changes we are willing to live with and which includes proposed language in paragraph 10..." (id., p. 2). Therefore, the Desais' counsel was accepting some of the changes made to the agreement (id.). Apparently, counsel for the Receiver accepted the suggested changes (Doc. S-133-1, Ex. F, p. 31). However, an e-mail dated November 23, 2015, acknowledges that the Trustee had not reviewed the agreement at this point (id.).[18]

The Desais state that, after November 30, 2015, their counsel informed counsel for the Receiver by telephone that they were not in agreement with the mutual release with BankUnited (Doc. S-133, p. 8). The e-mail correspondence between the parties reflects that the Desais would not agree to the settlement agreement containing a mutual release with BankUnited, and the parties were aware of this objection. An e-mail dated December 7, 2015, clearly states "...not sure why Doc [Dr. Desai] would not

---

[18]The e-mail also indicates that a few changes from BankUnited were included in the draft (Doc. S-133-1, Ex. F, p. 31).

want such a release to be executed" (Doc. S-133-1, Ex. H, p. 53).   The following day, an e-mail from the Receiver's counsel to the Desais' counsel directs counsel to contact someone regarding Dr. Desai's questions concerning the release and the financial statements forms (id., Ex. I, p. 55).[19]

An e-mail dated December 15, 2015, from the Receiver's counsel further shows that the parties were aware that Dr. Desai was not in agreement with the draft agreement (see id., p. 63).  The e-mail explains that the draft agreement "ha[d] been approved by the trustee, the receiver, BankUnited, and all the settling officers and directors except Dr. Desai" (id.). The e-mail further clarifies that once a draft was approved by "the trustee, the receiver, BankUnited, the officers and directors, and RSUI" then the draft would be sent to Navigators for approval (id.).[20]  Therefore, at this point, the

_____

[19]The e-mail states "Please call Robbie about Dr. Desai's questions regarding the release of BankUnited and the form of financial statements...." (Doc. S-133-1, Ex. I, p. 55).

[20]The e-mail clarified (Doc. S-133-1, Ex. L, p. 63):
> Curt Miner and Bob Martinez wanted a few more days to discuss the attached documents with Dr. Desai.   In particular, Dr. Desai may want some further clarification about the financial statements required to verify his financial condition and also expressed an interest in the administration of the receiver's claims allowance process. Because those matters should not affect RSUI or Navigators, and because the review and comment by everyone has taken much longer than initially anticipated, the trustee and the receiver decided to send you the most recent draft for RSUI's separate review and comment; we will provide you with a separate redlined document containing any other

Desais had not approved the agreement and Navigators' approval also was required.

That the parties did not reach a final settlement agreement is further supported by the "Parties' Fourth Joint Status Report to Court" filed by the parties on December 15, 2015 (Doc. 98). According to the report, "all of the Defendants, with one exception, have approved a final proposed form of the agreement" (id., p. 3). The joint status report also states that "[o]nce the Defendants are unanimous, they intend to forward the proposed agreement for review and approval by RSUI and Navigators" (id.). The parties also intend to "work diligently and have maintained settlement discussions multiple times per week since the previous Status Report" (id.).

An e-mail a few days later on December 18, 2015, confirms that the Desais did not agree to the mutual release with BankUnited (Doc. S-133-1, Ex. K, p. 60). Thus, the e-mail states (Doc. S-133-1, Ex. K, p. 60):

> When BankUnited entered into the settlement, BankUnited agreed to exchange mutual releases as part of the settlement. BankUnited is unwilling to modify the mutual releases so BankUnited can sue Dr. and Mrs. Desai or be sued by them. BankUnited decided to settle and to accept its agreed share of the settlement payment in lieu of a

---

comments or requested changes from Dr. Desai's if we [sic] and when [we] receive them.

> costly lawsuit against Dr. and Mrs. Desai or a
> lawsuit by them against the bank. Thus,
> BankUnited will not modify the agreed mutual
> releases by excluding Dr. and Mrs. Desai from the
> release.

Therefore, the parties were on notice that the Desais would not agree to the

settlement agreement if it contained a mutual release and, apparently,

BankUnited would not agree without having the release.

The Desais assert that in December 2015 the Fiduciaries then

sent RSUI for the first time the draft of the proposed settlement agreement,

and that they were no longer part of the negotiation process (Doc. S-133, p.

9).   Thus, according to the Desais, the Fiduciaries finally agreed to a

settlement in May 2016 (id.).

The "Parties' Fifth Joint Status Report to Court" filed on January

15, 2016, further supports the assertion that the parties did not have a

complete settlement agreement in December 2015 (Doc. 99).   According to

the joint status report, "[t]he [d]efendants are working in good faith to reach

agreement on a final proposed form of the agreement" and that agreement

"was forwarded to RSUI for review and comment on December 15, 2015"

(id., p. 3).   The joint status report explains that the defendants and RSUI

continue to have telephone discussions concerning the agreement and "[o]nce

RSUI provides proposed revisions" the parties will "work diligently to agree on a final form to be approved by Navigators" (id.). Thus, in January 2016 RSUI still had to review the agreement and that proposed agreement required Navigators' approval.

The joint status reports continue to reflect an unfinished settlement agreement. According to the joint status report filed on February 16, 2016, the settlement agreement was not finalized (Doc. 100). The joint status report indicates that the Fiduciaries reviewed RSUI's comments and proposed revisions (id., p. 3). Further, the Fiduciaries also made "additional revisions" to the draft agreement that required RSUI's approval (id., p. 4). The status report further indicates that "[u]pon approval by RSUI, the [p]arties will be in a position to finalize the agreement with the remaining [d]efendants and Navigators" (id.). Therefore, in February 2016, the agreement still required the approval by RSUI, the defendants and Navigators.

According to the joint status report filed on March 15, 2016, a settlement agreement had not been finalized (Doc. 102). The joint status report explains that since December 2015, RSUI and the Fiduciaries were working on terms of the settlement agreement and that "only one significant

item remains" (id., p. 2).[21]   The joint status report also indicates that the parties still had to "consider any additional terms proposed by Navigators" and "expect to circulate the final written agreement" (id., p. 3). Because there was still a significant issue remaining, and the parties had to consider Navigators' additional proposed terms, the parties had not reached a settlement.   Indeed, the joint status report foreshadowed that there is a "possibility of an additional dispute over the settlement itself should the [p]arties and Navigators fail to execute a written agreement" (id.).

In sum, contrary to the position of the proponents, the joint status reports filed by the parties do not demonstrate that the parties had a settlement agreement to all essential terms but, rather, the parties were still in the midst of negotiations and could not agree to essential terms.   R. O. Parsons v. Orthalliance, Inc.,130 Fed. Appx. 353 (11th Cir. 2005) (no enforceable settlement agreement even though all parties and the mediator had signed a settlement term sheet where there were further negotiations of a final settlement); see Tomlinson v. Landers, 2009 WL 1117399 *4 (M.D. Fla. 2009) (party's removal of language and proposing second release to plaintiff was evidence that negotiations were ongoing and parties had not reached a

--------

[21]The joint status report explains that the RSUI policy was implicated in other cases and RSUI was working towards resolving those issues (Doc. 102, pp. 2-3).

settlement agreement to an essential term); see also Wisekal v. Laboratory Corp. of America, 2016 WL 4154781 *3 (S.D. Fla. 2016) (despite parties phone call to chambers and filing of notice that the parties had reached settlement, no enforceable agreement where parties continued to negotiate essential terms and could not reach an agreement as to those terms); Williams v. Ingram, supra ("incomplete agreements will not establish a sufficient meeting of the minds to create an enforceable settlement agreement"); Suggs v. Defranco's, Inc., supra, 626 So.2d at 1101 (no enforceable agreement where essential terms left for future negotiations).

E-mails from April and May 2016 demonstrate that there was not a finalized settlement agreement between the parties. An e-mail dated April 22, 2016, discusses a settlement number with RSUI and whether the Fiduciaries would agree to the amount (see Doc. 133-1, Ex. N, p. 97).[22] Moreover, e-mails from April 29, 2016, upon inquiry from the Desais' counsel, indicate that an agreement had not been reached with the Fiduciaries (see Doc. S-133-1, Ex. O, p. 99). Thereafter, an e-mail dated May 9, 2016, declares that a deal was reached with the Fiduciaries, however, they wanted

---

[22]The email states "...Mazer asked us for RSUI's best and final number for the DeFossett hold-back, which we provided to him this morning. He said the Fiduciaries will say yes or no by the middle of next week" (Doc. S-133-1, Ex. N, p. 97).

an additional term added to the agreement (the "blow-up" provision) (Doc.

S-133-1, Ex. P, p. 101). Thus, the e-mail states (id.):

> We have reached a deal with the Fiduciaries. They
> agreed to a DeFosset Reserve of 225k but wanted
> the right to void the entire deal should the burn on
> the policy exceed[] 1.575 million before the Final
> Approval Orders. We said OK.

> I assume they now turn to you, Bill and Navigators.

The following day, an e-mail was sent to the parties' counsel with the

attachment of the final version of the draft settlement agreement (Doc. S-133-

1, Ex. M, p. 88).

In sum, the evidence demonstrates that the other parties, apart

from the Desais, were still in the process of negotiating settlement terms until

May 2016. Accordingly, a settlement agreement was not reached between the

parties.

### 2. Mutual Release

A release can be an essential term in an agreement. Rolex Watch

U.S.A., Inc., v. Bonney, 546 F.Supp.2d 1304, 1308 (M.D. Fla. 2008); see

Cheverie v. Geisser, supra, 783 So.2d at 119 (no enforceable agreement

where "plaintiff did not agree to the indemnification language in the

release"); Gaines v. Nortrust Realty Management, Inc., supra, 422 So.2d at

1040 (no settlement agreement where parties did not have mutual understanding regarding a release); see also Thompson v. Estate of Maurice, 150 So.3d 1183, 1188 (Fla. Dist. Ct. App. 2014) (no enforceable agreement where defendant counter-offered by asserting new essential term of conditioning its acceptance on the plaintiff's execution of a release); but see, Miles v. Northwestern Mut. Life Ins. Co., 677 F.Supp.2d 1312, 1316 (M.D. Fla. 2009) (an e-mail mentioning the drafting of the release did not alter the binding settlement agreement).  Moreover, when parties have a dispute "as to the character, nature, or type of release to be used, an essential element of the agreement is not established."  Cheverie v. Geisser, supra.

        There is no dispute between the parties that the mutual release contained in the settlement agreement is an essential term.  The proponents assert the mutual release was always a part of the agreement and, therefore, the settlement agreement should be enforced against the Desais (Doc. S-134, pp. 2-3).  The proponents further explain that BankUnited will not sign the agreement without it containing the mutual release and the agreement cannot proceed without the Desais (id., pp. 3, 10).  The Desais counter that they have not agreed to the settlement agreement because it contains a mutual release with BankUnited (Doc. S-133, pp. 8-9, 19-20).

As indicated, the proponents assert that the release with BankUnited was always a part of the settlement agreement and was part of the agreement reached on April 21, 2015 (Doc. S-130, p. 3). However, the proponents have not submitted evidence that the mutual release was always a part of the agreement. The Desais, in fact, submitted evidence of the Settlement Term Sheet (which was later discarded), and the release language in it primarily focuses on RSUI (Doc. S-133-1, Ex. B, p. 7).[23] Thus, the

---

[23]The Settlement Term Sheet provides (Doc. S-133-1, Ex. B, pp. 7-8):
Upon RSUI's payment of its entire settlement amount to the Fiduciaries in accordance with the terms and conditions of this Term Sheet, RSUI will be fully and absolutely released by the Fiduciaries, BankUnited, and the Defendants, jointly and severally, from any and all claims or actions against RSUI relating to its obligations (if any) arising under the Policy. Further, upon RSUI's payment of its entire settlement amount to the Fiduciaries in accordance with the terms and conditions of this Term Sheet, the Fiduciaries will be fully and absolutely released by RSUI from any and all claims, sanctions, damages, demands, suits, debts, actions, or causes of action of any kind held by RSUI related to the Fiduciaries' and/or BankUnited's respective estates or claims under the Policy that RSUI ever had or may now or hereafter own, hold, have, or claim to have by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date the Approval Orders are entered. Except to the extent otherwise expressly provided in any other settlement term sheet or settlement agreement executed and delivered by or for all of the Fiduciaries, BankUnited, and the Defendants, Navigators Insurance Company is not and will not be a beneficiary of or otherwise released by this settlement.

Settlement Term Sheet does not include the mutual release between the Desais and BankUnited (see id., pp. 7-8).

However, as evidenced by an e-mail dated October 27, 2015, the mutual release was included in the draft settlement agreement and the Desais' counsel was aware of it (Doc. S-133-1, Ex. E, pp. 23-24).[24] Indeed, Desais' counsel in an e-mail dated November 19, 2015, attached the draft settlement agreement that included the releases between the Desais and BankUnited (Doc. S-130-5, Ex. E, p. 8). Counsel for the Desais edited a paragraph that contained the release with BankUnited, but did not delete the release (id.), adding that "our response … accepts the changes we are willing to live with" (id., p. 2). This e-mail is evidence that the Desais' counsel appeared to be in agreement with the release provision because he did not request that it be deleted. However, the proponents have not submitted evidence that the Desais themselves agreed to the mutual release.

In this respect, after November 30, 2015, the parties were aware that the Desais did not agree to the mutual release with BankUnited (Doc. S-133, p. 8). Counsel for the Desais in an e-mail dated November 30, 2015, in response to the Receiver's counsel's question regarding an "update on the

_____

[24]The releases were included in paragraph 8, subsections c and d. (Doc. S-133-1, Ex. E, pp. 23-24).

written agreement[,]" responded that he was meeting with his client at the end of the week (Doc. S-133-1, Ex. G, p. 51). Counsel for the Desais further states that "I will not be able to get back to you until we have met with him (Dr. Desai)" (id.). Therefore, this correspondence indicates that counsel still required the approval of the Desais for the agreement and counsel for the Receiver was aware it.

Thus, the Desais assert in their memorandum that their counsel notified counsel for the Receiver by telephone that they did not agree to the release with BankUnited (Doc. S-133, p. 8). The evidence demonstrates the Desais raised their objection to the release by December 2015 after their counsel had presented them with the agreement. Notably, the Desais never signed the agreement demonstrating their assent. Further, an e-mail dated December 7, 2015, indicates that other counsel were aware that the Desais did not agree to the release (see Doc. S-133-1, Ex. H, p. 53). The e-mail states "I'm not sure why Doc [Dr. Desai] would not want such a release to be executed" (id.).

Furthermore, even if the Desais were bound by the assent of their attorney, they could negate that assent while the negotiations were on-going. The proponents seem to suggest in their reply that once the Desais' counsel

said they could live with the red-lined version of the draft settlement that included mutual releases with BankUnited, the Desais were bound by that response. However, as explained in detail, negotiations were continuing and other parties still needed to review the draft agreement. The proponents have provided no authority that, during this period, the Desais could not either, upon their first review, reject the provision or, if they had already agreed to it, change their minds. There is no reason why, when the draft was being reviewed, the draft was not open to changes by the Desais. "Settlement agreements are not considered final when the record establishes the parties' intend to take further action prior to the completion of a binding agreement" Dows v. Nike, Inc., supra, 846 So.2d at 602; see also Williams v. Ingram, supra ("Nor may an agreement be determined to be final where the record establishes that it is the intent of the parties that further action be taken prior to the completion of a binding agreement").

Significantly, months later, the Fiduciaries added the "blow-up" provision to the draft agreement. Since that provision could be added to the agreement, a different provision could logically be removed. No case has been cited supporting a "no strike-back" limitation to the negotiation of a settlement agreement.

In sum, the mutual release in this case is an essential term, and the record at this point reflects that there was no meeting of the minds because the Desais did not agree to, and in fact objected to, that term in the draft of the settlement agreement.

### 3. "Blow-up" provision

In addition, the parties' submissions demonstrate that the draft settlement agreement presented to the Desais in May 2016, added a new essential term that clearly was not agreed to by them. The Desais, therefore, meritoriously argue that the May 2016 draft settlement agreement included a new material term, known as a "blow-up" provision, that was never discussed with them, and thus never assented to (Doc. S-133, pp. 10-11, 20). The proponents counter that the inclusion of the "blow-up" provision is not a valid basis to repudiate the agreement because it is a contingency that may never happen and, therefore, it is not an essential term (Doc. S-134, pp. 4-5).

"Generally, the acceptance of an offer which results in a contract must be absolute and unconditional, identical with the terms of the offer..." and "an acceptance must contain an assent to the same matters contained in the offer." Cheverie v. Geisser, supra, 783 So.2d at 1119 (internal citations and quotations omitted); see Grant v. Lyons, 17 So.3d 708, 710 (Fla. Dist. Ct.

App. 2009) (same).  "[An] acceptance must be a "mirror image" of the offer

in all material respects, or else it will be considered a counteroffer that rejects

the original offer."  Pena v. Fox, 2015 WL 7074652 *2 (Fla. Dist. Ct. App.

2015).  Therefore, there is no meeting of the minds when a party adds a new

term into a settlement agreement.  Id. at *2-3.

On May 9, 2016, counsel for the Desais sent an e-mail to counsel

for RSUI inquiring about the status of the agreement with the Fiduciaries

(Doc. S-133-1, Ex. P, p. 101).  Counsel for RSUI responded the same day via

e-mail (id.):

> We have reached a deal with the Fiduciaries.  They
> agreed to a DeFossett Reserve of 225k but wanted
> the right to void the entire deal should the burn on
> the policy exceed 1.575 million before the Final
> Approval Orders. We said OK.
>
> I assume they now turn to you, Bill and Navigators.

The paragraph at issue is 5.a. of the settlement agreement and it provides

(Doc. S-130-6, Ex. F, p. 3):

> RSUI will pay the Fiduciaries, under the primary
> insurance policy issued to Universal Health Care
> Group, Inc., as the insured (RSUI policy no.
> HP648986, with a policy period of 11/01/2012 to
> 11/01/2013) with the aggregate limit of five million
> dollars ($5,000,000) (the "RSUI Policy"), the
> aggregate RSUI Policy limit of $5,000,000,
> reduced by (i) all defense expenses actually paid in

lawful currency by RSUI under the RSUI Policy ("Covered Defense Expenses"); (ii) the "Defosset Reserve" described in sub-paragraph b. below; and (iii) the sum total of settlement payments made by the Defendants to the Fiduciaries in the amount of one million dollars ($1,000,000).

The "blow-up" provision in the settlement agreement states (id., pp. 3-4):

In the event that Covered Defense Expenses exceed $1,570,000, this Agreement may be voided prior to the Final Approval Orders by either of the Fiduciaries upon written notice to the parties in Paragraph 16 below.  If either of the Fiduciaries exercises this right, this Agreement will be void and the parties hereto will be returned to the *status quo ante* as though this Agreement never existed. If neither of the Fiduciaries exercises this right, it will expire once the Approval Orders become the Final Approval Orders.

This "blow-up" provision gives the Fiduciaries the unilateral right to void the entire agreement prior to it being finally approved by the appropriate courts if the expenses for the defense exceed $1,570,000.00 (id.). Therefore, if the Fiduciaries exercise this option, the parties will be placed in a position as if no agreement ever existed between the parties.  The Desais explain that this contingency may likely happen as the expenditures by RSUI for the defendants' defense already was at a total of $1,286,556.00 on June 15, 2016 (Doc. S-133, p. 21). The proponents do not dispute that the Desais did not agree to this term in the agreement.  The proponents counter, citing,

Robbie v. City of Miami, 469 So.2d 1384 (Fla. 1985), that the "blow-up" provision is a contingency that may never happen and, therefore, it is not an essential term that affects the validity of the settlement agreement (Doc. S-134, pp. 4-5). The proponents' argument is not persuasive.

In the first place, a provision that completely voids a settlement agreement cannot reasonably be called a non-essential term. After all, the Desais, as well as the other parties, have invested a great deal of time, effort, and, undoubtedly, attorneys' fees in seeking to reach a settlement. Consequently, a term that renders those factors wasted is plainly a material provision.

The Fiduciaries therefore added an essential term to the agreement, thereby significantly changing the agreement. In other words, the Fiduciaries did not accept the draft settlement presented to them, but instead made a counter-offer by adding a new term. Pena v. Fox, supra.

The proponents' reliance on Robbie v. City of Miami, is misplaced. In Robbie v. City of Miami, the Florida Supreme Court held that an Act of God provision in the settlement agreement was not an essential term of the contract, rendering the settlement agreement unenforceable. 469 So.2d at 1385-1386. The court explained that the amendment of the agreement to

add the Act of God provision was a "mere contingency" that may be applied

if an extra Miami Dolphins game was not played. Id. at 1385.[25] Therefore,

the Court determined that in the event an Act of God prevented the team from

playing the extra game, the parties could litigate that matter at a later date.

Id. at 1386. Thus, the Court explained the parties had agreed to the other

essential terms of the agreement concerning the extra games and the amount

due if the games were not played. Id.

However, the "blow-up" provision is unlike the Act of God

contingency in Robbie v. City of Miami. An act of God is an extraordinary

and unforeseeable event. In this case, the Desais have asserted that the

"blow-up" provision is reasonably likely to come into play. Thus, as

indicated, the Desais submit that the defense expenses back in June 2016,

reached $1,286,556.00 (Doc. S-133, p. 21).[26] When considering the parties

---

[25]After the Miami Dolphins did not play the requisite number of games due to a
football strike, the city sued the team for rent as a result of the unplayed games. Robbie v.
City of Miami, supra, 469 So.2d at 1385. The parties reached a settlement agreement that
the Miami Dolphins would play an extra game in 1985 and 1986, however, "if either extra
game is not played 'for any reason' the Dolphins will pay $30,000 per game." Id. The
original contract between the parties excused the team for rent obligations if a game was
not played due to an Act of God. Id. The city then included in the new agreement that if
the Dolphins did not play the tenth game due to an Act of God, then the team would have
to pay $30,000. Id. The Dolphins then filed suit seeking enforcement except for the Act
of God provision.

[26]The notion that defense costs could reach the amount of $1,570,000.00, is clearly
capable of happening. In an e-mail from RSUI's counsel on April 29, 2016, it stated
"Holland & Knight is burning 40k a month and the DFS (understandably but way too late

and the complexities of the case involved, it is not unforeseeable that the defense expenditures could reach $1,570,000.00, thereby giving the Fiduciaries the unilateral right to void the entire contract.

In sum, the proponents have not met their burden and shown an enforceable agreement exists. The parties' submissions demonstrate that they continued negotiations until May 2016, which resulted in the addition of a new essential term in the draft settlement agreement. There is no evidence that the Desais ever agreed to this new material term. This provides an additional reason why a settlement agreement was not reached.

IV.

For these reasons, I recommend that the Dispositive Joint Motion to Enforce Settlement Against Defendants, Akshay M. Desai and Seema Desai and Request to Remove from Trial Docket and Continue all Deadlines Pending Adjudication of the Settlement (Doc. 116) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

---

in the day) wants that to stop. In-fighting on Fiduciaries side it seems" (Doc. S-133-1, Ex. O, p. 99).

DATED: November 9 , 2016

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.